HOWARD v. MECHANICS' BANK et al.

(District Court, E. D. New York. January 6, 1920.)

1. PLEDGES ⬅31(4)—LIABILITY OF PLEDGEE FOR CONVERSION.

A bank, holding certain new automobiles in pledge as security for a loan, which, on bankruptcy of the debtor, nominally sold them for less than their value to a director, who resold them singly through an agent at a profit, which was turned over to the bank, *held* accountable to the trustee in bankruptcy for the difference between its debt and the amount actually received, with interest.

2. PLEDGES ⬅25—LIEN OF PLEDGEE LIMITED TO PROCEEDS OF WRONGFUL SALE.

A pledgee of property of bankrupts, which ostensibly sold it for the amount of its debt, but afterwards received from the purchaser the profit on resales, *held* to have waived any right to a lien for expenses incurred for storage before its sale.

3. BANKRUPTCY ⬅188(1)—EFFECT OF WRONGFUL SALE BY PLEDGEE OF BANK-RUPT.

A pledgee, which wrongfully sold the pledged property, *held* estopped to claim a lien for a greater amount than it received on an accounting to the trustee in bankruptcy of pledgors for the value of the property.

4. BANKRUPTCY ⬅154—RIGHT OF BANK TO APPLY FUNDS ON UNSECURED IN-DEBTEDNESS.

A bank, which as pledgee wrongfully sold property of bankrupts at private sale for the amount of its lien, but afterwards received the profit from resales by the purchaser, which it held as its own, *held* estopped, on an accounting to the trustee, to apply such sum on unsecured indebtedness of bankrupts.

In Equity. Suit by William Howard, Jr., trustee in bankruptcy of Senior Bros., against the Mechanics' Bank and the Brooklyn Trust Company and Walter S. Ward, executors of N. Willard Curtis, deceased. Decree for complainant.

Horace W. Palmer, of New York City (Charles A. Taussig, of New York City, of counsel), for plaintiff.

Gray & Tomlin, for defendant Mechanics' Bank.

Bruce R. Duncan, of Brooklyn, N. Y., for defendant executors.

CHATFIELD, District Judge. The plaintiff seeks to set aside a conveyance from the defendant bank to the decedent, Curtis, and for an accounting for the market value of some eight automobiles, which it alleges both the bank and the decedent converted, and for the value of which they should be held as trustees. Five of these automobiles are what is known as "Light Sixes," and three as "Twin Sixes," all of the model of 1916, made by the Pathfinder Company, and sent to Brooklyn upon the orders of Senior Bros., the bankrupts herein.

The Mechanics' Bank of Brooklyn had previously advanced certain money upon the strength of warehouse receipts for ten cars, and had possession of them as security. Two of these cars were sold three days before bankruptcy. The remaining eight were sold by the bank to N. Willard Curtis, one of the directors, and then sold to customers, who were told, by men who knew of the bank's transaction, that the

cars could be bought cheap, and to apply to one of the bankrupts, acting as salesman at the bank's request. The proceeds were turned over to the bank. Out of these proceeds the bank repaid themselves the amount due upon the Curtis note, with interest, and thus met the amount of the so-called purchase by Mr. Curtis. The balance was applied on other indebtedness of Dr. Frank S. Senior, father of the bankrupts. The record actually shows that Mr. Roy Senior, one of the bankrupts, was told by the representatives of the bank that each car could be sold for any price over the amount which they owed to the bank on each car, and that, if he obtained more, the bank would apply it for the benefit of his father's account. Since the beginning of the action, Mr. Curtis has died, and his executors have been brought in to defend the action in his place.

It appears that these cars were sold at a time when the Pathfinder Company had no regular repair station or sales office in Brooklyn. One was opened in New York before all of the cars were disposed of, but by parties entirely independent of the Seniors. The Pathfinder Company had placed upon the market in the meantime a 1917 model, which did not differ greatly in structure, but contained some changes of appearance, and the testimony has gone at length into the obtainable price for cars of the sort involved herein under the circumstances existing during the time through which Mr. Roy Senior made sales of these cars. It appears that the buyers of these cars knew that they were getting them at reduced rates. None of the cars were sold from any place recognized as a show room or agency. Each buyer had information that they were being disposed of under such circumstances as would indicate a forced sale of some kind. Each buyer endeavored to get his car as cheap as he could do so, while Mr. Senior apparently endeavored to get as much as the buyer would give.

It was in no case the ordinary commercial transaction of hunting out buyers, who were to be interested in the cars and talked into making the purchase on such terms as the agent was ready to give in making sales. Nor were any of them such sales as would be made where a customer came into an agency and was looking for a car at the lowest price for which the agency would dispose of cars. Each sale in the present case was on a cut rate or forced sale basis, and the value of the cars under those circumstances was what could have been obtained in that kind of a market, rather than the amounts which represented the usual sales price of the cars, or the amounts which might have been obtained if the business of selling the Pathfinder automobiles had been going on in the usual course.

[1] On the evidence it is apparent that Mr. Senior procured fairly good prices for the cars. His willingness to let the cars go at any price which would cover the claims of the bank was evidently restrained by the knowledge that the bank would give his father the benefit of any surplus up to the amount of his father's indebtedness, and the testimony does not indicate that he slaughtered prices, or let the cars go for less than any one else could have obtained under similar circumstances. It will therefore be found that the amount at issue in this case, representing the value of the cars, for which an accounting should

be had, does not exceed the sum which was actually turned over from the purchase of these cars to the bank.

The plaintiff alleges that Mr. Curtis and the bank acted with knowledge of all the circumstances preceding the time when Mr. Curtis nominally bought these cars from the bank. At that time the bank had the right to hold these particular cars and to proceed in a statutory way or according to law to convert the property pledged into money, to pay its debt, and to account for the balance, or to dispose of the property by auction, on giving proper notice, and to apply the proceeds to the liquidation of its debt, accounting for the surplus, if any. The plan adopted by the bank, of selling to some one burdened with knowledge of the facts, for an amount admittedly less than the value of the property, and then to receive the benefit of the full amount realized, was a violation of the duty which the bank owed as a trustee, even when acting upon its legal rights in selling the property to liquidate its debt.

Both the bank and Mr. Curtis held this trust relationship to the bankrupts' creditors, and are liable to account for the difference between the amount due on the notes, with interest to the date of sale to Mr. Curtis, and the total amount actually received. The plaintiff is entitled to receive interest upon this balance from the time of its payment to the bank until the entry of judgment.

[2] An item of $454.96 is sought to be charged by the bank for the amount of storage accrued against these cars when they were taken possession of by the bank, shortly after bankruptcy. When the bank made ostensible sale to Mr. Curtis, it did not include in the purchase price this charge for storage. It is impossible to tell how the bank expected to reimburse itself therefor, or whether it anticipated proving this amount merely as a general creditor of the bankrupts. But it is evident that the bank expected to receive, through Mr. Curtis, additional moneys upon the sales of these cars. They waived any claim of lien or right to apply moneys in their hands to the payment of expenses, by holding out to the world what appeared to be a flat sale for the face value of their debt. To allow the bank to profit by its own wrongdoing, and to thereafter deduct charges as to which the lien had been waived, would not be equitable under the circumstances, and for these charges upon the automobiles the bank should be allowed nothing but a general claim against the bankrupt estate.

[3] If any interest was due thereafter upon the amount which Mr. Curtis was supposed to have paid, it would be a charge against his estate, and his estate cannot come in and insist that the executors be relieved by an admission of primary responsibility on the part of the bank, and at the same time ask that the bank be allowed to enforce a claim for interest, not against them, but against an innocent third party. If the bank considered the notes paid by the sale to Mr. Curtis, except in so far as they may have had a balance at that time which was provable as a general claim against the bankrupt, it cannot now be heard to transfer this balance into a secured claim.

[4] The bank also raises the contention that it has the right to apply any amount which came into its hands from the sale of these

eight automobiles to the payment of other indebtedness owing by the bankrupts to the bank, and for which the bank preferentially took possession of certain other automobiles, which were sold and the proceeds kept by the bank, which has been ordered to pay back the sums involved, leaving it to its proof of general debt for that amount.

The proposition urged by the bank would be true in the ordinary sense. Its right to set off funds in its hands against any indebtedness owing by the bankrupt to it is unrestricted, except in so far as the funds sought to be so used are definitely held as trust funds for a certain purpose, or as the property of another party. But in the present case the bank attempted to dispose of its property to Mr. Curtis, without crediting to the bankrupt anything at all out of the sum which might come into its hands as surplus, and has therefore estopped itself from applying that surplus as a set-off on the amount due to the bank from the bankrupts. It holds the balance which it received from Mr. Curtis in trust to liquidate the claim against his estate, and if the bank applies these funds, or any part of them, to the payment of its own debts, which it may still have the right to do under the bankruptcy law, then judgment for the amount which the bank fails to turn over must be rendered against the estate of Mr. Curtis, which is also jointly liable.

The plaintiff may have a decree for the amount received by the bank over and above its indebtedness upon the notes given, with the eight cars in question as security, together with interest to the date of the sale to Mr. Curtis, in so far as that interest has not been paid. The plaintiff may have interest upon the amount so received from the date of payment of the various sums to the bank, and judgment should run against both the bank and the estate of Mr. Curtis, but with the provision that the debt shall be paid primarily by the bank, and that recourse shall be had against the estate of Mr. Curtis only in such amount as the bank may fail to pay.